IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MAGIC LEAP, INC., | § § § | |
| Plaintiff | § § | |
| vs. | § § | Civil Action No.  4:18-cv-133 |
| TODD KEIL, | § § | |
| Defendant. | § § | |

**PLAINTIFF MAGIC LEAP, INC.'S
<u>COMPLAINT FOR DECLARATORY JUDGMENT</u>**

Pursuant to 28 U.S.C. §§ 2201-2202, Plaintiff Magic Leap, Inc. brings this action for declaratory judgment against Defendant Todd Keil, alleging as follows:

**I.   NATURE OF THE CASE**

1. This case involves a disgruntled current employee of Magic Leap, Defendant Todd Keil, who has asserted frivolous legal claims against Magic Leap in an effort to extort millions of dollars.  Mr. Keil joined Magic Leap in September 2015 as its Senior Director of Global Security, after leaving a position at the Department of Homeland Security in 2012.  In making the move to the private sector, Mr. Keil failed to appreciate the performance standards and commitment expected at firms such as Magic Leap.  Since his arrival at Magic Leap, Mr. Keil has failed to perform his job duties with the dedication and degree of competence any employer would expect from its employees, and that its employees would expect from one another.  Sensing a potential termination of his employment, he has baselessly asserted that he is the victim of retaliation for raising various issues with his superior over a year ago that fell within the scope of his duties as a Senior Director of Global Security.  Mr. Keil believes that

Magic Leap does not want these items disclosed in the public forum and has demanded payment of millions of dollars from Magic Leap in exchange for not publicly filing these baseless whistleblower claims. Mr. Keil perceives he has leverage to utilize this sensitive information concerning these security-related matters — which are covered by a Confidentiality/Nondisclosure Agreement that he signed when he joined Magic Leap — because if exposed, they may generate serious adverse consequences for Magic Leap's ongoing development efforts. Magic Leap brings this action to obtain declaratory judgment on each of the baseless claims asserted by Mr. Keil, in order to establish its legal rights to proceed with crucial business partnerships and personnel decisions essential to its ongoing operations.

## II. PARTIES

2. Magic Leap, Inc. ("Magic Leap" or "Plaintiff") is a Delaware corporation with its principal place of business in Plantation, Florida.

3. Todd Keil ("Keil" or "Defendant") is an individual residing in McKinney, Texas, who is currently a Magic Leap employee.

## III. JURISDICTION AND VENUE

4. Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), and federal question jurisdiction pursuant to 28 U.S.C. § 1331.

5. Diversity jurisdiction exists because (a) there is complete diversity of citizenship between Plaintiff Magic Leap and Defendant Keil, and (b) the amount in controversy exceeds $75,000. Federal question jurisdiction exists because one of the causes of action in this matter — declaratory judgment on the age discrimination claim— arises under a federal statute, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA").

6. Venue is appropriate under 28. U.S.C. § 1391 because Mr. Keil is a resident of this judicial district.

## IV. FACTUAL BACKGROUND

7. Magic Leap's business involves the development of sophisticated augmented reality technology and related products. Magic Leap currently employs almost 1,400 people in facilities in Florida, Texas, Washington State, California, and several remote and overseas locations.

8. Magic Leap has invested heavily in its technology and its personnel, with a goal of launching products that will transform the way humans interact with computers and their environment. In December 2017, Magic Leap unveiled its "Magic Leap One," a head-mounted virtual retinal display, which superimposes 3D computer-generated imagery over real world objects by projecting a digital light field into the user's eye. Magic Leap is working hard to bring that product to the market as soon as possible. Because Magic Leap is currently in the pre-launch stage of product development and testing, maintaining security around its technologies, prototypes, facilities, and intellectual property is a matter of vital importance for its future business prospects.

9. In September 2015, Magic Leap hired Defendant Todd Keil as its Senior Director of Global Security. In that role, Mr. Keil initially reported to Magic Leap's Executive Officer and Senior Vice President, Henk Vlietstra. Mr. Keil had two direct reports, and job duties that covered a wide array of workforce, facilities and intellectual property-related security responsibilities, as well as strategic business risk mitigation.

10. Mr. Keil's job performance at Magic Leap through the last quarter of 2015 and 2016 did not inspire confidence. Mr. Keil appeared to be disengaged in performing his services and to have a gross misunderstanding of the basic rules, regulations, and market standard practices in areas on which he was hired to advise Magic Leap (*e.g.*, the hiring of foreign

nationals, International Traffic in Arms Regulations, 22 C.F.R. §§ 120 *et seq*.). Notwithstanding the foregoing, because he was still relatively new in his Senior Director position, Magic Leap management hoped that his performance would improve in 2017.

11. Magic Leap experienced significant growth through 2016, placing greater demands on Mr. Vlietstra and other senior managers. As a result, several of the company's top performers were promoted to higher positions, and certain reporting relationships were altered. One such change in late 2016 involved Mr. Keil no longer reporting directly to Mr. Vlietstra. Instead, going forward he would report directly to a newly promoted Vice President, Eric Akerman, who became VP of Information Technology, Physical Security and Dev Ops. Despite the change in the reporting relationship, Mr. Keil's role and responsibilities did not change.

12. Mr. Keil did not take kindly to the change in the reporting relationship, which he incorrectly characterized as a "demotion." Subsequently, his performance not only failed to improve, but instead deteriorated significantly in 2017, as he became more detached and less committed to the timely execution of his job responsibilities. For example, Mr. Keil worked remotely more often, failed to promptly respond to emails (if he responded at all), failed to attend scheduled meetings (including, without limitation, one high risk off-site meeting that involved a Magic Leap's People team member and an employee who were being terminated and had a history of erratic behavior), fell severely behind in achieving various goals, failed to finish or make progress on important projects, failed to properly maintain contractual relationships with security firms (including, without limitation, engaging a U.S. based security firm that Mr. Keil had a personal relationship with to perform services in Magic Leap's Israel office at a cost in excess of $250,000 per year more than reasonable, competitive charges for similar services in Israel), and generally failed to engage or perform at any level expected of an employee. Co-

workers and business partners with whom Mr. Keil worked were increasingly frustrated with his disengagement and inaction.

13. Mr. Keil's performance in 2017 was so lackluster, and his lack of any sense of urgency and commitment so apparent, that certain co-workers began to wonder whether Mr. Keil actually *wanted* to be terminated. From their perspective, he was simply "phoning it in," which was a posture sharply at odds with the corporate culture of Magic Leap. One example of Mr. Keil's detachment in 2017 was his failure to even provide input into his own 2017 performance review.

14. By December 2017, Mr. Keil recognized that his job performance at Magic Leap was generally regarded by his supervisors and co-workers as unsatisfactory. Rather than re-dedicating himself to his Magic Leap job responsibilities, Mr. Keil decided to take pre-emptive action and falsely pose as a victim of unfair employment practices. Adopting that course of action, he engaged an attorney, who communicated to Magic Leap's General Counsel that she intended to sue Magic Leap on Mr. Keil's behalf. Mr. Keil, through counsel, submitted a draft Complaint to Magic Leap that asserted a wholly baseless claim for violation of the Florida Whistleblower Act, Fl. Stat. §§ 448.101 *et seq*. In addition, Mr. Keil informed Magic Leap that he had filed an equally baseless age discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*., and the Florida Civil Rights Act, Fl. Stat. §§ 760.01-.11. Mr. Keil's attorney stated that she intended to file the Complaint, and planned to add the age discrimination claim to the litigation as soon as she receives a "Right to Sue" letter from the EEOC, which she expected shortly.

15. Mr. Keil's draft Complaint, provided to Magic Leap's General Counsel in mid-December 2017, asserted a claim for violation of the Florida Whistleblower Act based on three predicate acts/events, in which Mr. Keil alleged he was the victim of unlawful retaliation for his oppositional activity as a Magic Leap employee.

**Alleged Violation of the DTSA**

16. The first of the alleged predicate acts involved the arrival at the Magic Leap offices — unanticipated by Magic Leap management — of several devices known as the Microsoft HoloLens. The HoloLens is a head-mounted display unit designed for certain augmented reality applications. In 2016, Microsoft made advance copies of the HoloLens available for purchase.

17. In May 2016, two Magic leap employees who had previously applied to participate in Microsoft's developer program were invited to purchase, and lawfully obtained, two HoloLens devices each. In the same timeframe, one of Magic Leap's business partners applied for and lawfully obtained another HoloLens device, and sent that HoloLens to Magic Leap. Of these five devices, only three made their way into the Magic Leap offices. There was nothing illegal or nefarious about the acquisition of these commercially available devices, or their introduction to the Magic Leap premises.

18. Of the three HoloLens devices that Magic Leap received, only one of the packages containing a device was ever opened by Magic Leap employees. Upon learning that HoloLens devices were onsite through an email broadly circulated at Magic Leap, Magic Leap management promptly (1) confiscated all three that had arrived; (2) arranged for their prompt return to Microsoft and/or the business partner, as appropriate, and (3) immediately issued an order to all necessary parties requiring that the other two devices that were in transit be refused

for delivery at the door, which two devices were refused and returned to Microsoft. While certain Magic Leap employees did visually inspect and briefly use the one HoloLens device that was removed from its packaging, there was no effort at reverse engineering the product.

19. In his draft Complaint that was delivered to Magic Leap nineteen (19) months after the occurrence of the alleged incident, Mr. Keil falsely alleges that Magic Leap's management rejected his recommendation that all of the HoloLens devices be confiscated and returned. He further alleges, falsely, that he was told by a senior manager that Magic Leap would retain possession of one device. Mr. Keil then asserts, without factual or legal basis, and long after the occurrence of the alleged event, that Magic Leap's conduct in this matter violated the federal Defend Trade Secrets Act, 18 U.S.C §§ 1836 *et seq.* ("DTSA"). In reality, Mr. Keil received prompt instructions from Magic Leap management, on its own initiative, that he should work with others to recover and return all the devices, and he was tasked with physical custody of the seized devices until their return could be arranged. Significantly, Mr. Keil has not alleged nor can he allege that Magic Leap retained any of the five (5) HoloLens devices or any other facts to support his claim that Magic Leap violated the DTSA.

20. Mr. Keil further alleges that Magic Leap retaliated against him for his role in discussing the business risks associated with the arrival of the HoloLens devices at the Magic Leap offices. That allegation is also false, as Magic Leap took prompt action to ensure that all the devices be collected and returned, and no adverse consequences ensued for Mr. Keil.

**Alleged Violations of EAR and ITAR**

21. The second predicate act that Mr. Keil falsely alleges violated the Florida Whistleblower statute involved two situations that Mr. Keil contends violated (and purportedly continue to violate) U.S. Export Administration Regulations, 15 C.F.R. §§ 730 *et seq.* ("EAR")

...

and the International Traffic in Arms Regulations, 22 C.F.R. §§ 120 *et seq*. ("ITAR"). Mr. Keil raised a misinformed alarm concerning these regulations in connection with the presence at Magic Leap in 2016 of several summer interns from Iran and China. Mr. Keil's draft Complaint, delivered eighteen (18) months after the alleged event, falsely asserts that the existence of this summer internship program allowed these foreign nationals to gain access to controlled technology in violation of EAR and ITAR. Mr. Keil further alleges that his advice to terminate that internship program was angrily rejected, and he was the victim of retaliation from Magic Leap management for raising the issue.

22. Mr. Keil's draft Complaint alleges another instance of EAR and ITAR violations in connection with Magic Leap's business partnership with a technology company based in London. Mr. Keil alleges that in November 2016, thirteen months before the delivery of Mr. Keil's Complaint, the London-based company was acquired by a Chinese firm that has ties to Chinese military intelligence. He contends that by sharing Magic Leap technology and prototypes with the London-based company, Magic Leap is violating both EAR and ITAR. Mr. Keil further alleges that his recommendation to discontinue the business partnership was not only ignored, but that, here again, Magic Leap management retaliated against him for raising the issue.

23. Mr. Keil's allegations in connection with the EAR and ITAR are false because its products and technology are not controlled for export by either the EAR or ITAR. Magic Leap sought and received export classifications for its products and technology from the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"). Under the BIS export classification determination, Magic Leap can export its products to all countries without the need for an export license, except for countries or regions subject to U.S. sanctions. Further, Magic

Leap can disclose its EAR99 technology to an Iranian intern while the intern is legally resident in the U.S. Magic Leap has not violated, and is not violating, EAR.

24. Likewise, contrary to Mr. Keil's baseless allegations, Magic Leap's products are not subject to ITAR, which only applies to products identified in the U.S. Munitions List. *See* 22 C.F.R. §§ 120.6, 121.1. Magic Leap's products are not on that List. It has not manufactured a defense item, designed defense technology, or provided defense services. Thus, Magic Leap has not violated, and is not violating, ITAR. Nor has Magic Leap retaliated or taken any adverse action against Mr. Keil for his role in raising concerns about EAR/ITAR issues.

**Alleged Violations of Fl. Stat. § 934.03**

25. The third predicate act that Mr. Keil falsely alleges violated the Florida Whistleblower statute involved an effort by Magic Leap's VP of Information Technology, Physical Security and Dev Ops, Eric Akerman, in January 2017, to test the integrity and proper functioning of Magic Leap's security camera system. In his Complaint delivered to Magic Leap eleven (11) months after the alleged incident, that testing effort has been mischaracterized by Mr. Keil as an instance of illegal interception of oral communications in violation of Fl. Stat. § 934.03.

26. Magic Leap had experienced incidents in the past where images of its devices and facilities had been publicly disclosed without consent or authorization. With responsibilities for physical security, Mr. Ackerman wanted to assess whether the security cameras in the newly opened Florida facility might be vulnerable to manipulation or disruption by handheld personal devices, including digital cameras. To test his theory, Mr. Ackerman brought a personal digital camera to his Magic Leap office. He placed the camera conspicuously on a desk in the office he shared with Mr. Keil and plugged it in for purposes of the test. The camera was only able to

transmit and, as noted in a demonstration of the camera Mr. Ackerman gave to another Magic Leap employee, it did not record images or sound although there was a minor network delay to the device showing the camera feed. Thus, Mr. Keil's speculative allegation that his oral communications or image, or those of others, were surreptitiously recorded is false.

27. Mr. Keil falsely alleges that he brought this to the attention of Mr. Vlietstra, but that his concerns were ignored. In fact, the camera was promptly disengaged and removed from the premises following the complaint from Mr. Keil. Nevertheless, even though the camera was only in place for a short time, Mr. Ackerman was able to demonstrate vulnerabilities in Magic Leap's security camera system by hacking into the system using the digital camera. As a result, Magic Leap reconfigured the security camera system and servers to ensure that no one could access and disrupt the system using personal devices in the future.

28. Mr. Keil may have been upset with Mr. Ackerman for exposing a security flaw for which Mr. Keil was responsible, but the test involving the digital camera was done openly and without either the intention or the capability of recording audio or visual images. Thus, there is no factual or legal basis for Mr. Keil's allegation that Magic Leap violated Florida law.

29. Mr. Keil further alleges, falsely, that Magic Leap retaliated against him for raising questions about the digital camera that Mr. Ackerman used during his test. In fact, Mr. Keil was not the target of any retaliation or adverse employment actions for discussing this issue.

**Alleged Age Discrimination**

30. On or about December 14, 2017, Mr. Keil also filed a charge of unlawful age discrimination against Magic Leap with the EEOC, and asked that the EEOC cross-file the charge with the Florida Commission on Human Relations. A copy of that charge and certain correspondence associated with it was provided to Magic Leap's General Counsel by Mr. Keil's

attorney. In submitting that charge, Mr. Keil requested that the EEOC issue an immediate Notice of Right to Sue, so that Mr. Keil's attorney could promptly file a lawsuit against Magic Leap alleging unlawful age discrimination.

31. The age-based "harassment and discrimination" that Mr. Keil alleges he suffered while at Magic Leap overlaps almost completely with the instances of retaliation he alleges in violation of the Florida Whistleblower Act. These alleged adverse employment actions consist of the following:

(1) not being promoted to Vice President in late 2016, when three other Senior Directors were promoted to that rank;

(2) the altered reporting relationship that followed those promotions, which entailed Mr. Keil reporting to one of the newly promoted VPs, Mr. Ackerman;

(3) alleged "angry rants" from Mr. Vlietstra when Mr. Keil brought the above-referenced security-related issues to his attention;

(4) not being provided with a pay raise in October 2016;

(5) not being invited to provide security support for a meeting of the Magic Leap Board of Directors in California in March 2017;

(6) being excluded from various unidentified meetings and matters that Mr. Keil felt he should have participated in;

(7) being, as Mr. Keil puts it, temporarily "saddled with" the job responsibilities of one of his direct reports following the resignation of that individual in April 2017;

(8) following Mr. Keil's inordinate delay in hiring a replacement for that direct report, Mr. Ackerman's decision to hire a replacement himself and have the new hire report to him rather than to Mr. Keil;

(9) an erroneous second-hand report from one of the candidates for that position that Mr. Keil's title was Senior Director, Physical Security rather than Senior Director of Global Security, which Mr. Keil alleges "denote[s] a reduction in stature and responsibility"; and

(10) an allegation that Mr. Ackerman told one of Mr. Keil's subordinates in December 2017 that he intended to terminate Mr. Keil soon.

32. The instances of alleged retaliation and adverse actions described above are either not adverse actions, factually inaccurate, or legitimate business decisions made by Magic Leap. None of them are instances of unlawful retaliation or age-based discrimination, though some were the result of Mr. Keil's own deeply flawed job performance.

33. The false and misleading allegations set forth in Mr. Keil's draft Complaint and in his age discrimination charge submitted to the EEOC (*i.e.*, the allegations described in paragraphs 14-32 above), along with his attorney's stated intention to file the draft Complaint and add the age discrimination claim as soon as she receives a "Right to Sue" letter from the EEOC, create an actual, substantial, and justiciable controversy between Magic Leap and Mr. Keil of sufficient immediacy and consequence to warrant the rendering of a declaratory judgment by this Court.

34. Magic Leap requests resolution by the Court of the legal challenge posed by Mr. Keil regarding its alleged liability, including its right to terminate Mr. Keil's employment without such action being deemed a violation of law. Magic Leap likewise requests resolution of the legal challenge posed by Mr. Keil regarding ongoing personnel practices and business partnerships alleged to violate EAR and ITAR, among other alleged statutory violations.

Pursuant to 28 U.S.C. §§ 2201-2202, this Court should declare the rights and legal relations of the parties hereto with respect to the following:

## V. CAUSES OF ACTION: DECLARATORY JUDGMENT

**Count I:** **Declaratory Judgment of Magic Leap's Non-liability with respect to Violation of Florida Whistleblower Act, Fl. Stat. §§ 448.101** *et seq.*

35. Plaintiff Magic Leap re-alleges and incorporates paragraphs 1 through 34 above as if fully set forth herein.

36. Plaintiff Magic Leap has not violated the Florida Whistleblower Act, Fl. Stat. §§ 448.101 *et seq.*, in its conduct towards Defendant Todd Keil with respect to Mr. Keil's allegations concerning violation of the DTSA.

37. Plaintiff Magic Leap has not violated the Florida Whistleblower Act in its conduct towards Defendant Todd Keil with respect to Mr. Keil's allegations concerning violations of EAR and ITAR. Magic Leap's summer internship program in 2016 did not violate those regulatory regimes, nor does Magic Leap's ongoing business partnership with a London-based technology company.

38. Plaintiff Magic Leap has not violated the Florida Whistleblower Act in its conduct towards Defendant Todd Keil with respect to Mr. Keil's allegations concerning illegal interception of communications in violation of Fl. Stat. § 934.03.

39. Declaratory relief is necessary and appropriate in this case because Defendant's allegations place a cloud of uncertainty over Plaintiff's business activities related to its ongoing personnel practices and business partnerships. Pursuant to 28 U.S.C. §§ 2201-2202, Magic Leap is entitled to a declaratory judgment that it is not liable for any violation of the Florida Whistleblower Act, Fl. Stat. §§ 448.101 *et seq.*, in its conduct towards Defendant Todd Keil.

**Count II: Declaratory Judgment of Magic Leap's Non-liability with respect to Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*., and the Florida Civil Rights Act, Fl. Stat. §§ 760.01-.11**

40. Plaintiff Magic Leap re-alleges and incorporates paragraphs 1 through 39 above as if fully set forth herein.

41. Plaintiff Magic Leap has not violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*., in its conduct towards Defendant Todd Keil.

42. Plaintiff Magic Leap has not violated the Florida Civil Rights Act, Fl. Stat. §§ 760.01-.11 in its conduct towards Defendant Todd Keil.

44. Declaratory relief is necessary and appropriate in this case because Defendant's allegations place a cloud of uncertainty over Plaintiff's business activities related to its need to resolve the currently unsustainable situation involving a senior manager responsible for corporate security. Pursuant to 28 U.S.C. §§ 2201-2202, Magic Leap is entitled to a declaratory judgment that it is not liable for any violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*., or the Florida Civil Rights Act, Fl. Stat. §§ 760.01-.11 in its conduct towards Defendant Todd Keil.

## VI. REQUEST FOR RELIEF

Magic Leap respectfully requests the following relief:

1. A declaratory judgment that Magic Leap is not liable for any violation of the Florida Whistleblower Act, Fl. Stat. §§ 448.101 *et seq*., in its conduct towards Defendant Todd Keil.;

2. A declaratory judgment that Magic Leap is not liable for any violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*., or the Florida Civil Rights Act, Fl. Stat. §§ 760.01-.11 in its conduct towards Defendant Todd Keil;

3. An award to Magic Leap of its reasonable attorneys' fees and costs as may be permitted by law; and

4. For such other and further relief that the Court deems just and proper.

DATED: February 28, 2018.

Respectfully submitted,

*/s/ Jason R. Elliott*
Jason R. Elliott
Texas Bar No. 24050558
JElliott@perkinscoie.com
Ann Marie Painter
Texas Bar No. 00784715
AMPainter@perkinscoie.com
M. Alexander Pratt
Texas Bar No. 24105953
AlexanderPratt@perkinscoie.com

**PERKINS COIE LLP**
500 N. Akard St., Suite 3300
Dallas, Texas 75201
Telephone: 214.965.7700
Facsimile: 214.965.7773

Craig Boggs (*Pro hac vice* forthcoming)
CBoggs@perkinscoie.com

**PERKINS COIE LLP**
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Telephone: 312.324.8628
Facsimile: 312.324.9628

**ATTORNEYS FOR PLAINTIFF MAGIC LEAP, INC.**